1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

NATIONAL PRODUCTS, INC.,

8                                 Plaintiff,

9    v.

10   GAMBER JOHNSON, LLC.,

11                                 Defendant.

12

No. C04-2524MJP

ORDER ON CLAIM
CONSTRUCTION

13

14       This matter comes before the Court on a claim construction hearing wherein the parties

15   requested construction of seven claim terms contained in claims 30 and 35 of Plaintiff National

16   Products, Inc.'s United States Patent No. 5,845,885 ("the '885 patent"). (See Dkt. Nos. 44 and 46).

17   Having reviewed the papers and pleadings submitted by the parties, and having heard oral argument

18   on the issues, the Court hereby issues the following constructions for the disputed claims terms:

19       a.  "Split Arm Assembly" means "an assembly containing two or more arm sections."

20       b.  "Bifurcated Arm Assembly" is defined as "divided into two parts cross-wise by the

21       releasable clamping means, with each part having a socket at its end."

22       c.  " A pair of relatively rigid arm sections which are adapted to be operatively juxtaposed to

23       one another along the line of juncture" means "two or more members made of a relatively

24       non-flexible material configured to produce the effect of being side by side along the line of

25       juncture."

26

d. "Releasable clamping means for reciprocating the pair of arm sections in relation to one another relatively crosswise the plane of the line of juncture" is defined as "a releasable clamp that brings the arm sections together, or allows them to be separated, relatively perpendicular to a plane containing the line of juncture."

e. "Apex" means "one end of the bifurcated arm assembly"

f. "First Loci" is defined as a "center point of a sphere that substantially coincides with inner spherical surfaces of first sockets of the arm sections." "The Second Loci (in claim 30)" is defined as the "center point of a sphere that substantially coincides with inner spherical surfaces of second sockets of the arm sections." "The Second Loci (in claim 35)" is defined as "a point in or on the base at an opposite end of the line of juncture from the first loci."

g. "First position of the bifurcated arm assembly" means "a configuration of the bifurcated arm assembly in which the first coupling member can be rotated relative to the first sockets." "Second position of the bifurcated arm assembly" means "a configuration of the bifurcated arm assembly in which the first coupling member is interlocked with the first sockets." "Third position of the bifurcated arm assembly" means "a configuration of the bifurcated arm assembly in which the first coupling member can be detached from the first sockets."

BACKGROUND

Plaintiff National Products, Inc.("NPI") brings this action against Defendant Gamber Johnson, LLC ("Gamber") for alleged infringement of U.S. Patent number 5,845,885 ("the '885 patent"). The '885 patent describes NPI's Universally Positionable Mounting Device. The inventor attempted to prosecute this patent twice before receiving his patent in 1997. The device at issue is used for attaching hardware such as computer screens, mobile phones, and GPS systems to a more stable surface. Each end of this device has a socket into which a hard rubber ball attached to a coupling device fits. This arrangement allows the mounted device to be positioned and remain stable at any angle. A clamp on the device allows the user to tighten or loosen the apparatus, as needed, to adjust its angle and positioning. An imaginary line of juncture runs down the middle of the device from ball

1   to ball.  When the clamp is tightened, the arms of the device move toward the line of juncture

2   tightening the arms' grip on the rubber ball ends; when the clamp is loosened, the arms move away

3   from the line of juncture, releasing their grip on the rubber ball ends.  The parties have submitted

4   seven terms of the '885 patent to this Court for construction.  All of these terms are found in claims

5   30 and 35 of the '885 patent.

6                                    ANALYSIS

7   I.  Markman Standard:

8          Claim construction is an issue of law for the Court to decide.  Markman v. Westview

9   Instruments, 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  In construing claims, the

10  Court looks first to intrinsic evidence, and only if necessary to extrinsic evidence.  In reviewing

11  intrinsic evidence, the Court first looks to the "words of the claims themselves."  Vitronics Corp. v.

12  Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "The general rule is that terms in the claim

13  are to be given their ordinary and accustomed meaning."  K-2 Corp. v. Salomon S.A., 191 F.3d 1356,

14  1362 (Fed. Cir. 1999).  In the alternative, "a patentee may choose to be his own lexicographer and

15  use terms in a manner other than their ordinary meaning, as long as the special definition of the term

16  is clearly stated in the patent specification or file history."  Vitronics, 90 F.3d at 1582.  The patent

17  specification is usually dispositive, as it is "the single best guide to the meaning of a disputed term."

18  Id.  On the other hand, claims are not limited to the embodiment disclosed in the specification.   "It is

19  well established that the preferred embodiment does not limit broader claims that are supported by the

20  written description."  Toro Co. v. White Consol. Indus. Inc., 199 F.3d 1295, 1301 (Fed. Cir. 1999).

21  In addition to the language of the claims and the specification, the final piece of intrinsic evidence

22  available to the Court in claims construction is the prosecution history of the patent.  Vitronics, 90

23  F.3d at 1582.  "The history contains the complete record of all the proceedings before the Patent and

24  Trademark Office, including any express representations made by the applicant regarding the scope of

25  the claims."  Id.

26

ORDER - 3

1    The Court looks to extrinsic evidence only if intrinsic evidence is insufficient to "resolve any

2    ambiguity in a claim term." <u>Id.</u> at 1583.  This is because "the claims, specification, and file history,

3    rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which

4    the public is entitled to rely." <u>Id.</u>  Extrinsic evidence may include expert and inventor testimony,

5    dictionaries, and learned treatises. <u>Markman</u>, 52 F.3d at 980.  Extrinsic evidence is reviewed in

6    claims construction at the discretion of the Court. <u>Id.</u>  Such evidence may be helpful "to explain

7    scientific principles, the meaning of technical terms, and terms of art that appear in the patent and

8    prosecution history," or  "may demonstrate the state of the prior art at the time of the invention." <u>Id.</u>

9    "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of

10   varying or contradicting the terms of the claims." <u>Id.</u> at 981.

11   <u>II.  Disputed Claim Terms</u>

12        <u>a.  "Split Arm Assembly"</u>

13        Paragraph 3 of claims 30 and 35, where this disputed term is found, reads: "a split arm

14   assembly comprising a pair of relatively rigid arm sections . . ." ('885 Patent, col. 24, ln. 15-16 & col.

15   26, ln. 11-12).  In its briefing, Defendant argued that the presence of the words "a pair" meant that

16   there could be only two arms.  At oral argument, however, Defendant modified its position to argue

17   that the presence of the term "a pair" indicates that there may only be an even number of arm

18   sections, which function effectively as two arm sections.  Plaintiff counters that the presence of the

19   word "comprising" in front of the words "a pair" means that the split arm assembly must contain at

20   least two relatively rigid arms.  In <u>Gillette Co. v. Energizer Holdings, Inc.,</u> the Federal Circuit found

21   that the word "comprising"is an open claim term meaning that an invention is made up of at least as

22   many components as described, but may include more. 405 F. 3d 1367, 1371-1373 (Fed. Cir. 2005).

23   In <u>Gillette</u>, the preferred embodiment of the patent at issue was a triple-bladed razor.  Nonetheless,

24   the Federal Circuit found that the patent in that case could also cover razors with four blades.  <u>Id.</u>

25   The use of an analogous interpretation in the case at hand is supported by the specification of the

26

'885 patent, which states: "in still other versions of my invention, there may be three or more arm sections that bear against the head of a coupler. . ."('885 Patent, col. 17, ln. 49-51).

Additionally, the Court observes that if Defendant's proposed definition were to be adopted, there would be virtually no difference between the term "split arm assembly" and "bifurcated arm assembly," as used in the '885 patent.  This construction violates the principle that each term of a patent is presumed to have meaning and courts should avoid claim constructions that render a term superfluous.  Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F. 3d 1111, 1119 (Fed. Cir. 2004). Defendant's proposed construction is erroneous--these terms have two distinct meanings within the '885 patent.  As will be explained in further detail below, Defendant misapprehends the meaning of "bifurcated" as used throughout claims 30 and 35 and attempts to relate it to the words "a pair" in order to limit the number of arm sections to two, or to an even number of arm sections.  However, this limitation is not found within the patent itself and will not be enforced by this Court.  See Phillips v. AWH Corp., 415 F. 3d 1303, 1323 (Fed. Cir. 2005) (even where a patent only describes one embodiment of an invention, the claims should not be construed as being limited to that embodiment.)

b.  "Bifurcated Arm Assembly"

The word "bifurcate," which is the root of the key word in this claim term, is defined as "[t]o divide into two parts or branches." The American Heritage Dictionary of the English Language 178 (4th ed. 2000).  Defendant uses a similar definition from the Merriam-Webster dictionary to support its argument that the illustrations attached to the '885 patent in Figures 1 and 2 show "an assembly having two arms and thus two parts." (Def's Br. at 12).  Plaintiff discounts this argument as Defendant's rehash of its argument, addressed above, that a pair means two or, as counsel noted in oral argument, an even number effectively functioning as two (Pl's Resp. at 6).  Plaintiff instead argues that the split arm assembly plus the clamp equal the bifurcated arm assembly.  However, the Court's reading of the patent and its prosecution history does not support either party's proposed definition.

Defendant is correct that the use of the word "bifurcated" in the '885 patent indicates that the device is divided into two parts. However, both parties seem to assume that this division must take place lengthwise, along or parallel to the line of juncture (Def's Ex. 4). The Court's reading of the patent, on the other hand, indicates that the inventor used the word "bifurcated" to specify that the clamping mechanism is to be situated in the middle section of the device, dividing it in two parts cross-wise or perpendicular to the line of juncture. Interpreted thus, the device would be "bifurcated" no matter how many arm sections are employed. The term "bifurcated" appears in paragraph 4 of claims 30 and 35, which claim a "releasable clamping means for reciprocating the pair of arm sections in relation to one another relatively cross-wise the plane of the line of juncture to form the split arm assembly into a bifurcated arm assembly." (Patent '885, col. 24, ln. 22-27 and col. 26, ln. 19-24). The prosecution history of the patent supports this interpretation. In an October 30, 1996 amendment to the patent application, the inventor points out, "initially, the arm assembly is a split arm assembly. When the clamping means are applied to it, because of the disposition of the clamping means between the loci of the balls, the split arm assembly is formed into a bifurcated arm assembly. . ." (Joint Appendix, Ex. B at 164). Looking at the patent as a whole, the Court finds that defining "bifurcated" to mean "divided into two parts cross-wise by the releasable clamping means, with each part having a socket at its end" captures the original intent of the inventor while harmonizing many of the seeming inconsistencies in the patent with which the parties struggle in their briefing.

The Court recognizes that this definition is not one suggested by either party. For this reason, if the parties wish to submit additional briefing on the definition of "Bifurcated Arm Assembly" to this Court, they may each submit a brief no longer than five (5) pages in length within ten (10) judicial days of the date of this Order. If received, the Court will treat these briefs procedurally as it would a motion for reconsideration.

c. " A pair of relatively rigid arm sections which are adapted to be operatively juxtaposed to one another along the line of juncture"

1      The claim terms at issue in this phrase are the terms "pair," "operatively," and "relatively

2  rigid." These terms appear in both claims 30 and 35 of the '885 patent. (Patent '885, col. 24, ln. 15-

3  17, col. 26, ln. 11-13). The term "pair" has been construed above. Here, it is preceded by the word

4  "comprising," meaning that it should be construed to mean, "at least two." Gillette, 405 F. 3d at

5  1371-1373. For this reason, the language that Defendant includes in its proposed definition that

6  serves to limit the patent to devices with only two arms is discarded.

7      Turning to the word "operatively," Defendant argues that the Court should construe the

8  phrase "operatively juxtaposed to one another across a plane coincident with the line of juncture" to

9  mean that "one arm part is entirely on one side of the line (and plane [of juncture]) and the other arm

10  part is entirely on the other side." (Def's Br. at 10). Defendant argues that the illustrations in the

11  specification consistently teach a device configured in this way. Defendant also argues that, "nothing

12  in the claims or in the patent specification provides that only a portion of each arm section or arm part

13  can be on one side of the line of juncture." (Id.).

14      Plaintiff, on the other hand, argues that there is much within the patent itself that counsels

15  against Defendant's proposed definition. Plaintiff cites sections of the patent specification calling for

16  an embodiment where the arms are "hingedly secured" to each other like a pair of scissors and where

17  the arm sections are of different sizes and shapes. (Patent '885, Col. 17, ln. 44-47). In these

18  embodiments, as well as embodiments where there are more than two arms, it would seem impossible

19  to require the arms to face each other in their entirety across the line of juncture. Plaintiff's proposal

20  that the arms should be construed to be, "configured to produce the effect of being side by side along

21  the line of juncture," therefore, provides the most consistency looking at the patent as a whole.

22  Relevant case law supports this point. The Federal Circuit has ruled that the word "operatively" is a

23  general descriptive term used to convey a "functional relationship between claimed components."

24  Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F. 3d 1111, 1118 (Fed Cir.

25  2004). For this reason, when a patent states that the components are operatively juxtaposed to one

26

1   another across a line of juncture, the Court construes the claim to mean that the parts should function

2   as if they were juxtaposed across the line of juncture.

3          The final disputed term in this phrase is "relatively rigid."  Defendant reads this term to mean

4   that the arm parts are unitary pieces, in addition to being made out of rigid material.  Plaintiff agrees

5   that the arm parts should be defined as being made out of rigid material; however, Plaintiff takes issue

6   with the notion that the patent limits the invention to embodiments with unitary arm pieces.  Plaintiff

7   argues that the Defense incorrectly relies on the illustrations to show that only unitary arm pieces are

8   taught.  Defendant also argues, however, that it finds support for the idea of unitary arm pieces in the

9   use of the word "sleeves"to describe the arm sections in the 1993 patent.

10         The Federal Circuit has noted that although the prosecution history is a useful tool for claim

11  construction, it is less precise than the specification because it is the product of an ongoing

12  negotiation between the PTO and the inventor.  Phillips, 415 F. 3d at 1317 (Fed. Cir. 2005).  Here,

13  use of the term "sleeves" in the prosecution history of this patent is not compelling enough evidence

14  that the inventor intended for the arm pieces to be unitary constructions because sleeves also need not

15  be unitary constructions.  Similarly, the Court will not import limitations into the claims from the

16  preferred embodiment of the patent. Curtiss-Wright Flow Control Corp. v. Velan, Inc., 2006 U.S.

17  App. LEXIS 3521 at 13 (Fed. Cir. 2006). For these reasons, the Court adopts Plaintiff's definition of

18  this claim term.

19         d. "Releasable clamping means for reciprocating the pair of arm sections in relation to one

20  another relatively crosswise the plane of the line of juncture"

21         Defendant argues that a means-plus-function analysis must be used to construe this claim.

22  Plaintiff opposes this position and asserts that this claim articulates sufficient structure to avoid a

23  means-plus-function analysis.

24         1) Means-plus-Function Analysis

25         The Patent Act, 35 U.S.C. § 112 ¶ 6  provides:

26         An element in a claim for a combination may be expressed as a means or step for
           performing a specified function without the recital of structure, material, or acts in

ORDER - 8

1        support thereof, and such claim shall be construed to cover the corresponding
       structure, material, or acts described in the specification and equivalents thereof.

2  The statute therefore allows an inventor to claim an invention by reference to the performed function

3 without identifying in the claim language the precise structure, material, or acts that would carry out

4 that function. IMS Technology, Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429-30 (Fed. Cir.

5 2000). Claims using the word "means" create a rebuttable presumption that "means plus function"

6 analysis is to be used. CCS Fitness, Inc. v. Brunswick Corp., 288 F. 3d 1359, 1369 (Fed. Cir. 2002).

7 Whether the presumption is rebutted depends on whether the claim term, when properly construed,

8 invokes sufficient structure to avoid construction under § 112 ¶ 6. Cole v. Kimberly Clark Corp., 102

9 F.3d 524, 531 (Fed. Cir. 1996) (concluding that "perforation means" was not a means plus function

10 limitation where the claim contained a detailed recitation of its structure).

11       2) The Court's Construction of this Term

12       Plaintiff asserts that the inventor has articulated a sufficient structure (a releasable clamp) to

13 avoid a means-plus-function analysis and that use of the word "means" is merely a rhetorical flourish.

14 Plaintiff urges the Court to follow the Federal Circuit's approach in Cole v. Kimberly-Clark, where

15 that court found that the phrase "perforation means" recited a sufficient structure (perforation) and

16 did not apply a means-plus-function analysis. 102 F. 3d 524, 531 (Fed. Cir. 1996). By contrast,

17 Defendant urges the Court to adopt a means-plus-function construction of this term that would

18 require the patented device to include, as part of the releasable clamping means, a yieldable biasing

19 mechanism (such as a spring) between the arms of the device.

20       The Court rejects Defendant's approach for two reasons. First, while other claims require a

21 yieldable biasing means, claims 30 and 35, which are the ones at dispute in this case, do not. For

22 example, claims one, two, and five describe a "means for producing a differential in the reaction of the

23 respective pairs of first and second end portions of the arm sections. . ." (e.g. Patent '885, col. 19,

24 lns. 61-63). There is no such language in claims 30 and 35. Second, Defendant's proposed

25 construction anticipates that the spring will be located between the pair of arm sections. Because this

26 Court has already decided, *supra*, that there may be more than two arm sections, this construction

does not make sense, taking the whole patent and its different potential embodiments into account. Finally, the language of the patent specification supports Plaintiff's argument. In the specification of the patent, the inventor states that, "means other than that shown may be employed as the clamping means. For example, vice-like *clamps* may be employed. . ." (Patent '885, col. 17, ln. 42-44, emphasis added). The Court finds that a clamp, like a perforation, is a sufficient structure to avoid means-plus-function construction. The Court, therefore, adopts Plaintiff's proposed construction of this term.

e. "Apex"

Here, Defendant proposes a definition of "apex" whose main purpose appears to be to reinforce the notion that there can only be two arm parts on this device and that this device must contain a yieldable biasing means, both of which arguments have been rejected by this Court. By contrast, Plaintiff's proposed construction provides that the apex corresponds roughly with the first or second loci. This definition comports with the ordinary meaning of "apex" to mean "[t]he highest point; the vertex" or "[t]he point of culmination." The American Heritage Dictionary of the English Language 82 (4th ed. 2000). Because this definition gives effect to plain meaning of the term as it would be understood by someone of ordinary skill in this art, and there is no other specific definition for this term in the patent, the Court adopts Plaintiff's proposed construction.

f. "First Loci" and "Second Loci"

Here, the only dispute between the parties is Defendant's desire to add limiting language providing that the loci are between the two arm sections. Because the Court finds that this patent covers embodiments that have more than two arm sections, inclusion of Defendant's proposed language is inappropriate. The Court construes this term in Plaintiff's favor.

g. "First position of the bifurcated arm assembly," "Second position of the bifurcated arm assembly," and "Third position of the bifurcated arm assembly"

This term presents a second situation where there are only slight differences between Plaintiff's and Defendant's proposed definitions. Defendant would only modify Plaintiff's proposed

definition by adding the phrase "while being engaged with the base" at the end of every sentence.  The Court finds that this is an unnecessary limitation because it is possible for the apparatus to be in each of the three positions described in the patent while remaining unattached to any outside structure. For this reason, the Court construes these terms as Plaintiff proposes.

CONCLUSION

The disputed terms are construed as follows:

a.  "Split Arm Assembly" means "an assembly containing two or more arm sections."

b.  "Bifurcated Arm Assembly" is defined as "divided into two parts cross-wise by the releasable clamping means, with each part having a socket at its end."

c.  " A pair of relatively rigid arm sections which are adapted to be operatively juxtaposed to one another along the line of juncture" means "two or more members made of a relatively non-flexible material configured to produce the effect of being side by side along the line of juncture."

d. "Releasable clamping means for reciprocating the pair of arm sections in relation to one another relatively crosswise the plane of the line of juncture" is defined as "a releasable clamp that brings the arm sections together, or allows them to be separated, relatively perpendicular to a plane containing the line of juncture."

e.  "Apex" means "one end of the bifurcated arm assembly"

f. "First Loci" is defined as a "center point of a sphere that substantially coincides with inner spherical surfaces of first sockets of the arm sections."  "The Second Loci (in claim 30)" is defined as the "center point of a sphere that substantially coincides with inner spherical surfaces of second sockets of the arm sections."  "The Second Loci (in claim 35)" is defined as "a point in or on the base at an opposite end of the line of juncture from the first loci."

g.  "First position of the bifurcated arm assembly" means "a configuration of the bifurcated arm assembly in which the first coupling member can be rotated relative to the first sockets." "Second position of the bifurcated arm assembly" means "a configuration of the bifurcated

1  arm assembly in which the first coupling member is interlocked with the first sockets."  "Third

2  position of the bifurcated arm assembly" means "a configuration of the bifurcated arm

3  assembly in which the first coupling member can be detached from the first sockets."

4  The Clerk is directed to send a copy of this Order to all counsel of record.

5      Dated: February 27, 2006.

6

7

8

9      Marsha J. Pechman
       United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - 12